UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| LAHANNAH FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 11-136-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| APPALACHIAN REGIONAL | ) | **OPINION & ORDER** |
| HEALTHCARE, INC., and | ) | |
| CAROLYN BOGGS, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff LaHannah Fields was a nurse at Hazard Regional Medical Center ("Hazard Regional") in Hazard, Kentucky, from September 2008 to May 2010. Her employment did not end amicably. In May 2010, the hospital forced her to resign because an internal audit revealed that Fields failed to document the use of controlled substances thirteen times over the course of a month. Fields sued on eight grounds, including breach of contract, intentional interference with contract, and retaliation. Defendants Appalachian Regional Healthcare, Inc., ("ARH"), the operator of Hazard Regional, and Carolyn Boggs, its director of nursing, have now moved for summary judgment. R. 21. Because there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law, the Court grants their motion.

## BACKGROUND

Hazard Regional uses a computerized machine called "Acudose" to store and distribute its controlled substances. Herald Decl., R. 21-4 ¶ 4. Nurses access Acudose with individual alphanumeric codes. *Id.* Each unit within the hospital has its own Acudose

machine, and each machine tracks which nurses receive controlled substances, along with the time and date of distribution. *Id*. Under the hospital's policies, every time a nurse receives a controlled substance from Acudose, that nurse is also responsible for documenting whether the dose is given to a patient, wasted (that is, properly thrown away), or returned to Acudose. *Id*. If a dose is marked as wasted, the nurse must input that information into Acudose and a witness must verify that the drugs were, in fact, wasted. *Id.* ¶ 5.

In April 2010, Hazard Regional's pharmacy director, Helen Herald, decided to conduct an audit of the hospital's Acudose machines. *Id.* ¶ 8. To perform the audit, she ran reports for the most frequently dispensed controlled substances at the hospital over the previous month and compared those reports to patients' medical records. *Id*. When she made that comparison, she discovered that three nurses—Monica Sculley, Amber Lewis, and Plaintiff LaHannah Fields—had received controlled substances, but never documented whether those substances were given to a patient, wasted, or returned. *Id.* ¶ 9. Specifically, Fields failed to account for controlled substances thirteen times over the past thirty days, errors that Herald believed to be "excessive under any circumstance." *Id*. Herald then reported her findings to Hazard Regional's director of nursing, Defendant Carolyn Boggs, the hospital's risk manager, Shirley Amburgey, and its human resources manager, Sheila Cornett. The four women decided that the hospital needed to fire all three nurses, and they informed Hazard Regional's chief executive officer, Donnie Fields, of their decision.

On April 21, 2010, Boggs, Cornett, Amburgey, and Lori Gilliam (Fields's immediate supervisor) called Fields in for a meeting to discuss the documentation errors. They also brought Judy Moore, Fields's union representative, with them. Fields, like all of the nurses

2

at Hazard Regional, was a member of the Kentucky Nurses Association,[1] so a collective bargaining agreement ("CBA") between ARH and the nurses association governed her employment. Cornett Decl., R. 21-2 ¶ 3. At that meeting, Boggs showed Fields the audit reports, and told her that she would be suspended for five working days. Fields Dep., R. 21-6 at 95-96. After that suspension, Fields would face a formal administrative hearing to decide her fate. Boggs Dep., R. 22-5 at 12-13. Fields recalls that she asked for a second chance, but Boggs told her there were "no second chances" for errors involving controlled substances. Fields Dep., R. 21-6 at 96. At that same meeting, Moore brought up the elephant in the room: she asked Boggs if Fields could go to rehab rather than face disciplinary action. *Id*. at 102. Boggs responded, "We're not doing that any more." *Id*. Fields herself asked if she could take a drug test to clear her name, but Boggs declined. *Id*.

After serving her suspension, Fields returned to the hospital on May 3, 2010, for a hearing with Boggs, Cornett, and Anita Jones, another union representative *Id*. at 103, 105. At that second meeting, Boggs told Fields that she had two options: resign or ARH would fire her. *Id*. at 105. Fields chose to resign, effective May 4, 2010. Cornett Decl., R. 21-2 ¶ 6. And Fields's case was not unique. Boggs gave Lewis and Sculley—the other two nurses who failed to account for controlled substances—the same choice. Both decided to resign. Cornett Decl., R. 21-2 ¶ 7.

On April 20, 2011, Fields sued Boggs and ARH in Perry County Circuit Court. Compl., R. 1-2. She alleged eight causes of action: breach of contract, intentional interference with contract, constructive discharge, unlawful retaliation, defamation, false

---

[1] The Kentucky Nurses Association is now known as Southern United Nurses/National Nurses United. Cornett Decl., R. 21-2 ¶ 3.

3

light, outrage, and civil conspiracy. *Id*. The defendants removed the suit to federal court on May 11, 2011, and filed their motion for summary judgment on March 1, 2012. That motion is now ripe for decision.

## DISCUSSION

### I. Claims Under the Labor Management Relations Act

Both sides agree that two of the claims Fields alleges—breach of contract and intentional interference with contract—are preempted by the federal Labor Management Relations Act. R. 21 at 16; R. 22-1 at 31. Section 301 of that act provides original federal jurisdiction over "[s]uits for violations of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). Because the goal of § 301 is to promote consistent federal resolution of labor disputes, the statute preempts state-law claims that require interpreting a collectively bargained contract. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (citing *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 23 (1983)). This form of "complete" preemption "converts an ordinary state common-law complaint into one stating a federal claim." *Id*. at 393 (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). Fields's breach of contract and interference claims are premised on the CBA between ARH and the Kentucky Nurses Association, so they are properly a § 301 claim.

The parties disagree, however, on what should happen next. The defendants believe that Fields's newly christened § 301 claim should fail because she did not pursue the grievance procedures available to her under the CBA before filing suit. R. 21 at 22-23. Normally, a union employee's failure to exhaust a mandatory grievance process precludes

suit under § 301. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965). This is true even when the employee's failure to exhaust results from the union's refusal to file a grievance. *See Vaca v. Sipes*, 386 U.S. 171, 191-93 (1967).

But a wrongfully discharged employee may still bring a claim in the face of an exhaustion defense. *Id*. at 186. That employee, however, must "prove that the union as bargaining agent breached its duty of fair representation in its handling of [his] grievance." *Id*. This is referred to as a hybrid § 301 claim. A hybrid § 301 claim actually involves two claims: (1) that the employer breached the CBA and (2) that the union breached its duty of fair representation. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (citing *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir.1994)). A plaintiff must establish both violations if she is to succeed against either party, as the claims are "inextricably interdependent." *Id*. That is not to say Fields must have sued both ARH and her union—she need not have. Instead, she must prove both claims regardless of which party she has sued. *Id*. at 538 n. 8.

Fields's hybrid claim hits an early hurdle. To prove her claim against the Kentucky Nurses Association, she must show that her union's "actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." *Id*. at 538; *see also Vaca*, 386 U.S. at 177 (describing a union's duty of fair representation as "a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law."). And even if Fields shows that her union failed to meet its legal duties, she must also show that those failures "tainted the grievance procedure" to such an extent that "the outcome was more than likely affected by the Union's breach." *Garrison*,

334 F.3d at 539 (quoting *Dushaw v. Roadway Express, Inc.*, 66 F.3d 129, 132 (6th Cir. 1995)).

Fields cannot meet that high bar here. She has not alleged that the nurse's association acted based on a discriminatory motive or in bad faith, so her only option is to show that her union acted arbitrarily. And a union's behavior is only arbitrary when, "in light of the factual and legal landscape at the time," the union acts "so far outside a wide range of reasonableness as to be irrational." *Garrison*, 334 F.3d at 538 (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 75 (1991)). "Mere negligence" by a union is not enough. *Id.* (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-73 (1990)). Fields claims that Moore, her union representative, failed to assert Fields's "right to progressive discipline," failed to tell Fields that the CBA contained specific grievance procedures or that Fields could present evidence in her defense, and discouraged her from filing a grievance. R. 22-1 at 35-36.

These assertions may all be true. But even if they are, the Kentucky Nurses Association's inaction does not meet the legal standard for arbitrary behavior. If anything, the union behaved reasonably in light of the strong evidence that Fields had committed serious malfeasance. The union arguably could have done more to inform Fields of her rights under the CBA. *See, e.g.*, Fields Dep., R. 21-6 at 22 (stating that she was unaware a CBA governed the terms of her employment). But Fields effectively admitted wrongdoing when she asked Boggs for a second chance, *id.* at 96, and she never contested the truth of the Acudose audit reports. Unions must act strategically to advance the interests of all of their members. Sometimes, a union may choose not to spend time, resources, and goodwill on a

fruitless grievance. By picking its battles, a union can best represent its entire membership. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 269-70 (2009) ("The union's interests and those of individual employees are not always identical or even compatible. As a result, the union may present the employee's grievance less vigorously, or make different strategic choices, than would the employee." (quoting *McDonald v. West Branch*, 466 U.S. 284, 291 (1984))). The Kentucky Nurses Association chose not to pursue Fields's case, and it made the same decision for the other two nurses who were fired for Acudose documentation errors. *See* Lewis Dep., R. 22-22 at 21-22 (stating that her union representative told her that a grievance was "not worth the effort"). This evidence shows that the union acted with consistency rather than caprice. Consequently, Fields cannot prevail on a fair representation claim since she has presented no evidence that the decision was arbitrary.

Because Fields's fair representation claim is "inextricably interdependent" with her claim that ARH violated the policies of the CBA, *Garrison*, 334 F.3d at 538, she also cannot succeed on her breach of contract claim. The defendants are therefore entitled to summary judgment on Fields's hybrid § 301 claim.

## II.     Retaliation

Fields also claims that the defendants fired her because she complained about operating conditions at Hazard Regional. Kentucky law prohibits health care employers from retaliating against any employee who reports that "the quality of care of a patient [or] patient safety . . . is in jeopardy." Ky. Rev. Stat. § 216B.165(1), (3). To establish a prima facie claim under that statute, Fields must show that: (1) she engaged in a protected activity; (2) the defendants knew she engaged in that activity; (3) she suffered adverse employment

action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Highlands Hosp. Corp. v. Castle*, No. 2007-CA-002432-MR, 2010 WL 2787906, at *4 (Ky. Ct. App. July 16, 2010) (citing *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004)).

What protected activity did Fields engage in? She claims to have complained about inadequate staffing in her hospital unit, an insufficient supply of clean linens, and an insufficient supply of "snack boxes" for patients who could not eat at regular meal times. R. 22-1 at 9-11. These complaints may seem minor, but they are protected activity. Any report that "the quality of care of a patient [or] patient safety . . . is in jeopardy" is protected by Kentucky's retaliation law. Ky. Rev. Stat. § 216B.165(1). Fields's complaints all related to the quality of care for Hazard Regional patients: without enough nurses, linens, or food, patients might not receive timely treatment, hygienic conditions, or appropriate nourishment.

Admittedly, the record contains only sparse evidence of Fields making complaints to her superiors. She recalls complaining "four or five times" about snack boxes, R. 21-6 at 74, but does not remember to whom she complained, *id.* at 66. She never complained to Defendant Boggs or to Hazard Regional chief executive officer Donnie Fields about the snack boxes. *Id.* at 66, 75. The one time Fields does remember complaining to Boggs and Donnie Fields was three weeks before she was fired. *Id.* at 80. She approached both of them in a break room and had a conversation about the lack of bed linens that lasted roughly "three minutes." *Id.*; *see also* Donnie Fields Dep., R. 22-8 at 22 (recalling that LaHannah Fields complained to him once, but not the subject of her complaint). She does not appear to have ever complained in writing. Nevertheless, this case is still at the summary judgment stage, so

8

the Court is required to view the evidence in the light most favorable to Fields and draw all justifiable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Fields's testimony alone is sufficient for the Court to draw an inference that she complained to Hazard Regional executive about hospital conditions that affected patients' quality of care. She therefore engaged in protected activity. If Fields recalled her complaints correctly, she can also meet the second element of a retaliation claim because the defendants knew of her protected activity. Additionally, the parties do not dispute that she suffered adverse employment action.[2] R. 23 at 12, n. 4; R. 22-1 at 15.

Fields falls short, however, on the last element of her retaliation claim: the causal connection between her protected activity and the adverse action. To establish a causal connection, Fields must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (quoting *EEOC v. Avery Denison Corp.*, 104 F.3d 858 (6th Cir. 1997)). Fields supports her causation argument with three contentions: (1) that Hazard Regional officials targeted her for the April 2010 Acudose audit so they could find her errors and fire her; (2) that she was singled out for harsher discipline than other nurses who made similar mistakes; and (3) that her firing occurred only three weeks after she complained to Boggs and Donnie Fields about insufficient bed linens. R. 21 at 18-21.

The record belies each of these assertions. Fields has submitted no evidence showing that she was targeted for an audit. On the contrary, the Hazard Regional pharmacy director, Helen Herald, stated in her declaration that she retrieved the Acudose records for the top

---

[2] Fields also asserts a separate "constructive discharge" claim, R. 1-2 at ¶¶ 37-41, but the constructive discharge Fields describes is equivalent to the adverse action element of retaliation. *See Brooks*, 132 S.W.3d at 807. The Court therefore considers Fields's discharge claim as part of her retaliation claim.

9

twenty-five percent of prescribed drugs at the hospital and compared those records to the patients' medical charts. R. 21-4 ¶ 8. That methodology audited *all* nurses at Hazard Regional, not just a select few. What's more, Boggs and other Hazard Regional executives had no advance knowledge of the audit and did not even know what procedures Herald would use. In her deposition, Boggs gave the following testimony:

> Q: And do you know how Ms. Fields was selected to be audited, her performance, or her documentation was selected to be audited?
> A: No.
> . . .
> Q: All right. How often does the pharmacy perform audits?
> A: I don't know exactly as to what their time schedule is.
> Q: How did Ms. Fields'[s] lack of documentation come to your attention?
> A: After [Shirley Amburgey] had reviewed it, she brought it to me.

Boggs Dep., R. 22-5 at 8-9; *see also* Herald Decl., R. 21-4 ¶ 10 ("Carolyn Boggs, Shirley Amburgey, Sheila Cornett, and Donnie Fields, Community Chief Executive Officer of Hazard ARH, did not participate in the audit in any manner."). This evidence shows that Fields was ensnared in a random dragnet, not a targeted stakeout.

Fields also did not receive a more severe punishment than other nurses who made similar errors. The April 2010 audit revealed two other nurses with documentation errors, Amber Lewis and Monica Sculley. Both received the same discipline as Fields: a five-day suspension, followed by termination. Boggs Dep., R. 22-5 at 10-11. In fact, Lewis said that "every" nurse in the hospital was "complaining all the time" about staffing levels, R. 22-22 at 51, but that she did not complain about bed linens, *id*. at 53, or food shortages, *id*. at 54-55. If, as Fields contends, Boggs and ARH targeted her for an audit because of her complaints about linens and snacks, it is curious that they also chose to audit and terminate a nurse who did not complain.

Lastly, the timing of Fields's firing is also not enough to establish prima facie causation. The Sixth Circuit has repeatedly cautioned against drawing an inference of causation solely from the temporal proximity of the plaintiff's protected activity and the defendant's adverse action. *See, e.g.*, *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support the finding of a causal connection."); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986). Yet under rare circumstances, extremely close timing can be enough. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (holding, in a case where the plaintiff was fired on the same day that his employer learned of his EEOC complaint, that "in rare cases, temporal proximity alone may suffice to show a causal connection").

Fields has not shown this to be one of those rare cases. The Acudose audit revealed Fields's documentation errors approximately three weeks after she complained to Boggs and Donnie Fields about the inadequate supply of clean linens. "Where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*; *see also Arendale v. City of Memphis*, 519 F.3d 587, 606-07 (6th Cir. 2008) (holding a two-month gap did not by itself establish causation); *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 502-03 (6th Cir. 2008)

11

(describing a one-month gap as a "closer call" but noting that the plaintiff failed to produce other evidence of retaliatory intent). Aside from timing, Fields has not shown any evidence of retaliatory intent: the defendants did not single her out for discipline or otherwise target her. In fact, she has not shown that Boggs or any Hazard Regional executives had any inkling of drug accounting problems before Herald's audit. By comparison, in *Mickey*, the Sixth Circuit permitted an inference of causation when an employer fired the plaintiff immediately after learning of his protected activity. *See Mickey*, 516 F.3d at 525-26. Earlier, the employer had also reduced the plaintiff's salary and benefits. *Id.*; *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) ("Even in *Mickey*, where we articulated the principle that temporal proximity could hypothetically be sufficient in a given case, we noted the presence of additional evidence.").

In short, Fields has not established a prima facie case connecting her complaint with her firing. As a result, her retaliation claim fails.

**III.  Defamation, False Light, and Outrage**

Fields has also alleged that the defendants committed three other torts by firing her. She has not, however, established the elements of a prima facie case of defamation, false light, or outrage. As a result, the defendants are entitled to summary judgment on these claims.

First, Fields believes that the defendants defamed her by firing her for drug use. Compl., R. 1-2 ¶¶ 48-54. To lay out a prima facie case for defamation, a plaintiff must show that the defendant published a statement that harmed her reputation in the community. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004). Fields fails this test on a

basic level: she cannot show that the defendants made any defamatory statements about her. Fields herself admits that neither Boggs nor any other Hazard Regional executive told her she was being fired for drug use. Fields Dep., R. 21-6 at 95-96. Instead, they told Fields that the hospital was firing her for failing to document controlled substances. *Id*. Admittedly, this reason might lead others to infer that Fields was using the missing substances. Fields's *own* union representative, Judy Moore, made that inference when she asked if Fields could go to rehab rather than lose her job. *Id*. But even in Fields's account of events, neither Boggs nor any other Hazard Regional official accused her of using the missing drugs. They only told her what the audit had revealed—that she had failed to account for controlled substances thirteen times in a month. Fields has not contested the audit's findings, so she can hardly accuse the defendants of defamation for restating its conclusions.

  Her false light claim fails for a similar reason. As the name "false light" implies, this cause of action requires that the defendant knowingly make a false statement about the defendant. *Hays v. Clear Channel Commc'ns, Inc.*, No. 2005-CA-001490-MR, 2006 WL 3109132, at *5 (Nov. 3, 1996) (quoting *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981)). That statement must also be "highly offensive to a reasonable person." *Id*. Again, this claim falls short for Fields. Even in her own telling of the facts, Boggs and ARH did not make any false statements about her.

  Lastly, Fields's outrage claim hits an equally fatal roadblock. Outrage, also commonly called intentional infliction of emotional distress, requires a plaintiff to suffer "extreme or outrageous conduct" that results in bodily harm. *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984) (adopting the definition of "outrageous conduct causing severe emotional

distress" from the Restatement (Second) of Torts § 46 (1965)).  Being fired for misconduct at work may be embarrassing, and perhaps Hazard Regional could have acted more discreetly towards Fields.  But the slings and arrows of ordinary life batter all of us who shuffle along this mortal coil.  *Cf.* William Shakespeare, Hamlet act 3, sc. 1.  Only conduct that is "utterly intolerable in a civilized community" rises to the level of intentional infliction of emotional distress.  *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 238 (Ky. Ct. App. 2001) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  Neither accusing a former employee of making improper sexual advances nor spreading rumors about the competency of former employees is outrageous enough to constitute intentional infliction of emotional distress.  *See Brett v. Media Gen. Ops., Inc*, 326 S.W.3d 452, 459 (Ky. Ct. App. 2010); *Miracle v. Bell Cnty. Emergency Med. Servs.*, 237 S.W.3d 555, 559-60 (Ky. Ct. App. 2007).  Terminating an employee for repeatedly failing to document the use of controlled substances is even less outrageous.  Fields has not alleged any facts sufficiently outrageous to support an emotional distress cause of action, so this claim also fails.

**IV.     Civil Conspiracy**

Fields also cannot maintain a civil conspiracy claim against the defendants. Conspiracy is a "corrupt or unlawful agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means. *People's Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 260-61 (Ky. Ct. App. 2008) (quoting *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (Ky. 1936)).  Fields has not shown that the defendants unlawfully forced her to resign or committed any other torts. Summary judgment is also therefore appropriate on her civil conspiracy claim.

## CONCLUSION

On all of Fields's claims, there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law. It is therefore **ORDERED** that the defendants' motion for summary judgment, R. 21, is **GRANTED**. The Court will issue a separate judgment in favor of the defendants this same day.

This the 5th day of June, 2012.

Signed By:
*Amul R. Thapar* AT
United States District Judge